**FREIGHT DRIVERS AND HELPERS
LOCAL UNION 557**

v.

**The ANCHOR MOTOR FREIGHT, INC.,
OF DELAWARE.**

Civ. No. 13718.

United States District Court
D. Maryland.

July 2, 1962.

Thomas E. Bracken, Baltimore, Md., for plaintiff.

Wm. W. Cahill, Jr., and George Cochran Doub, Baltimore, Md., and Wm. J. Curtin, Washington, D. C., for defendant.

NORTHROP, District Judge.

This is a labor dispute, detonated by the local union's having lodged a complaint with the employer. Jurisdiction is properly obtained under 29 U.S.C.A. § 185. See § 301 Labor Management Relations Act of 1947, 61 Stat. 156.

Neither the union nor management seeks to have the substantive matter of their dispute resolved in this proceeding. Formally, the narrow question presented by this litigation is whether the union's complaint is to be resolved through the grievance mechanisms created by the existing contract or at the bargaining table, through renegotiation.

The Anchor Motor Freight, Inc., of Delaware (Anchor) is a large shipper of motor vehicles with one of its many terminals located in Baltimore. On October 17, 1961, Anchor, along with fourteen other employers, and Freight Drivers and Helpers Local Union 557 (the

Local), with ten other local unions, entered into what might conveniently be called the Master Agreement, to which a Local Rider was added on December 15 of that year.

Although Anchor had no trailers to accommodate six-car shipments at the time of negotiating the Master Agreement, Art. 20, § 3A thereof established rate provisions for such shipments. Also, as the *quid pro quo* for a no-strike provision (Art. 8), management agreed to the inclusion of a provision creating grievance machinery under Article 6:

"SECTION 1. *Local Level*

\* \* \* \* \* \*

"SECTION 2. *Joint Committee*

"The Employers and the Unions parties to this Agreement shall together establish for the duration of this Agreement, the Eastern Conference Automobile Transporters Joint Committee. Any panel of the Joint Committee hearing a case shall consist of an equal number of designated representatives of the Employers and the Unions who are parties to this Agreement.

"SECTION 3. *Functions of Joint Committee*

"It shall be the function of the Eastern Conference Automobile Transporters Joint Committee *to settle disputes and grievances* which cannot be settled in accordance with Section 1 of this Article. \* \* \* A decision by a majority of a Panel of the Joint Committee shall be final and binding on the parties involved. \* \* \*

"SECTION 4. *Rights of the Joint Committee*

" \* \* \* A decision by a majority of a Panel of the Joint Committee shall be final and binding on all parties. \* \* \*

"SECTION 5. *Deadlock and Arbitration*

"*If any grievance or dispute* is not settled by a majority decision of the Panel of the Joint Committee as provided in Section 3 of this Article, and the Panel vote *results in a deadlock, then the grievance shall be submitted to an impartial arbitrator* who shall be named by the Local Union and the Company involved. \* \* \* It is agreed that the arbitrator is empowered to hear and decide the deadlocked case, even if only one of the parties submits to arbitration or, if either party fails to appear at the hearing, or to present evidence. *The arbitrator shall have the authority to interpret and apply the provisions of this Agreement, but shall not have the authority to amend or modify this Agreement.* \* \* \* The decision of the arbitrator shall be final and binding on the parties involved. *In the event that the losing party fails to abide by the arbitrator's decision, or that either party refuses to submit to his jurisdiction, the other party shall have the right to immediately take all legal or economic recourse.*

"SECTION 6. *Disputes and Requests for Interpretation*

"*Unless otherwise expressly provided in this Agreement, any and all disputes, including interpretations of contract provisions, arising under, out of, in connection with, or in relation to this collective bargaining agreement shall be subject to the grievance procedure of the Agreement.*"

[Emphasis supplied.]

The Master Agreement provided further for the negotiation of riders to deal with matters of a purely local nature.

Nowhere in the Master Agreement is there provision for the dispatching of trucks and drivers on a seniority basis. Such matters were resolved by a Local Rider to the Eastern Conference Area Truckaway and Driveaway Agreement (the Master Agreement) between the Local and Anchor, duly agreed upon and attached to the Master Agreement. Parts II and III of this Rider deal with

earning opportunity and dispatching, both based upon seniority. Generally speaking, these provisions state that those with greatest seniority are the last to be laid off and the first to select the trips they wish to take.

After the Master Agreement and the Local Rider had been entered into, the defendant Anchor—for the first time—acquired trailers capable of carrying six vehicles. Prior thereto, Anchor's trailers were of four- or five-car capacity. Shortly thereafter, Anchor informed the Local that it would not observe the Dispatch System contained in the Local Rider for the dispatching of the newly acquired six-vehicle trailers. This plan was put into effect on March 27, 1962, and now all drivers not on the six-vehicle list, regardless of seniority, are prevented from selecting six-vehicle trips. On the same day, the Local filed a grievance with the employer, alleging violations of Article 5 of the Master Agreement and Parts II, III and IX of the Local Rider. This complaint was submitted directly to the Joint Committee, and it met to resolve it on April 2, 1962.

However, the Joint Committee never resolved the dispute on its substantive merits. Anchor interposed the objection that it was not a matter properly subject to the grievance procedure of Article 6 but rather a matter for negotiation under Article 26.[1] The minutes of the pertinent meeting contain the following:

"The Panel in executive session deadlocked by equal vote as to whether or not the submission as submitted be treated as a grievance under the terms of Article 5 and 6 of the Master Agreement and Article II, III and IX of the Baltimore, Md. Trailer Drivers Rider or as a negotiable item under the terms of Article 26 and other applicable provisions of the Agreement."

We can find no genuine issue of material fact and must grant the Local's motion for summary judgment. In the first place, the wording of Article III of the Local Rider entitled Dispatch System clearly indicates that the parties had larger carrier rigs in mind.

"Total return load earnings and the difference in mileage and premium earnings, exclusive of skid drops, for loads of five (5) *or more cars* over four (4) car loads shall not apply to the $175.00 'Long Week,' straight time earnings for the purpose of calculating premium pay. [Emphasis supplied.]

---

1. (Excerpt from Eastern Conference Area Truckaway and Driveaway Agreement and Local Rider, June 1, 1961–May 31, 1964, Teamsters Local Union No. 557 and Anchor Motor Freight, Inc., Baltimore, Maryland)
"ARTICLE 26
"Local Matters and Riders
"SECTION 1. *Local Riders*
"(a) All conditions and matters considered by the Union and the Employer as 'local matters' and peculiar to the operations of the Employer and not of general application to the industry, shall be treated as local matters, and such conditions are to be reduced to writing and attached to this contract in the form of a rider and considered to be part thereof, provided, however, that such riders are first approved by the Eastern Conference Automobile Transporters Joint Committee.
"(b) This section shall not restrict the Union's legal right to organize.

"SECTION 2. *Approval of Local Riders*
"The Employer and the Union mutually agree that there may be added to this Agreement any article governing any phase of employment which they mutually deem necessary provided said change and/or rider is signed by both parties and attached to this Agreement as a rider, and provided further, that such rider is approved by the Eastern Conference Automobile Transporters Joint Committee.
"SECTION 3. *Local Riders—Deadlock*
"If the parties are unable to mutually agree on Local Riders within sixty (60) days from the date of the signing of this Agreement, the same must be referred to the Eastern Conference Automobile Transporters Joint Committee for decision. The Committee shall hold hearings and make a final decision. Its decision on such matters pertaining to the Local Riders shall be final and binding on both the Union and the Employer involved."

What is really at issue is the construction of the collective bargaining agreement, as it is in most cases of this type.

Anchor's position that, because the six-car rigs were not specifically mentioned in the Dispatch System part of the Local Rider, the dispatching of such rigs is a matter for the bargaining table, falls directly into the category of many disputes arising since the trilogy of cases decided in 1960 by the United States Supreme Court. United Steelworkers v. American Manufacturing Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L. Ed.2d 1403; United Steelworkers, etc. v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

The principles which these decisions emphasized are perhaps best stated in Taft Broadcasting Company v. Radio Broadcast Technicians Local Union No. 253 of the International Brotherhood of Electrical Workers, 5 Cir., 1962, 298 F. 2d 707.

> "First, the purpose to exclude a particular type of dispute from the arbitration promise must be clearly spelled out. And second, courts must overcome the temptation of passing on the intrinsic merits of the controversy under the guise of determining whether the dispute is within the promise to arbitrate." 298 F.2d 707, at p. 709.

See also United Steelworkers v. Warrior & Gulf Navigation Co., supra, at pages 568 of 363 U.S. and 1346 of 80 S.Ct., respectively. The court states that it is

> "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract."

To put it another way, as Judge Medina said, in Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Manufacturing Company, 298 F.2d 644, at pp. 645–646:

> "The nub of the matter is that under the broad and comprehensive standard labor arbitration clause every grievance is arbitrable, unless the provisions of the collective bargaining agreement concerning grievances and arbitration contain some clear and unambiguous clause of exclusion, or there is some other term of the agreement that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement. This is what is meant by the statement in the opinion in the Warrior & Gulf Navigation Co. case at pp. 582–583 of 363 U.S., at page 1353 of 80 S.Ct.:

> "'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"

Since the Supreme Court cases and numerous other cases following these decisions, it has been clearly established that the arbitrator is better equipped from the standpoint of both parties to handle the "industrial common law."

The decisions interpreting the standard broad arbitration clause, such as we have in this case, have

> "set up as matter of federal law a simple procedure, peculiarly suitable for the prompt disposition of miscellaneous labor disputes arising under collective bargaining agreements." Procter & Gamble Independent Union of Port Ivory v. Procter & Gamble Manufacturing Company, supra, at p. 646, of 298 F.2d.

There is nothing unique in the instant case to disturb this established procedure.

To require testimony to establish the intent of the party seeking to frustrate arbitration in these cases when the gauge

for their efficient and rapid disposition has been so formally set would be merely to retard the progress that has been made in this field of labor law.

"Nor can recourse be had to any bargaining history to resolve the issue. Arguments of this kind were pressed upon the Supreme Court in the Warrior & Gulf case and specifically rejected." International Ass'n of Machinists v. International Aircraft Services, Inc., 302 F.2d 808 (4th Cir., March 21, 1962).

In considering all that must be considered on a motion for summary judgment, there is a prima facie case of arbitrability.

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers v. Warrior & Gulf Navigation Co., supra, at pp. 582–583 of 363 U.S., at p. 1353 of 80 S.Ct.

It cannot be said with positive assurance that the arbitration clause presently under consideration "is not susceptible of an interpretation that covers the asserted dispute."

Under the established principles, further resolution should be left to the arbitrator, who shall determine conclusively whether or not the present dispute falls within the grievance machinery established by the Master Agreement. This disposition is necessary because of the limited degree to which we are authorized to interpret the agreement. Should the arbitrator answer this initial question in the affirmative, pursuant to the wishes of both parties the substantive question shall be remanded to the Joint Committee for its determination. Of course, if that body is unable to reach a conclusion, the matter again will have to be placed in the hands of the arbitrator.

